UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| MARY CORRADINO, | No. 19-Civ. 10434 (LGS) |
| Plaintiff, | SECOND AMENDED COMPLAINT |
| - against - | |
| LIQUIDNET HOLDINGS INC., AND SETH MERRIN, | |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiff Mary Corradino ("Corradino") by her attorneys, Vladeck, Raskin & Clark, P.C., complains of defendants Liquidnet Holdings, Inc. ("Liquidnet" or "the Company") and Seth Merrin ("Merrin") (collectively "defendants") as follows:

### NATURE OF CLAIMS

1. "Are you ever going to come home with me? How about tonight?" "Have you had an affair?" "What do you do for sex?" "You look like you would enjoy a big fat Cuban." These are among the sexually harassing comments that Corradino, an experienced Human Resources ("HR") professional, has had to endure during her tenure at Liquidnet. Much of this conduct has been perpetrated by the Company's Chief Executive Officer ("CEO") Seth Merrin, who made clear that he wanted to have a sexual relationship with Corradino. Remarkably, the conduct continued despite Corradino's complaints and her efforts to make the harassment stop. Corradino eventually complained through counsel about Merrin and Liquidnet's unlawful treatment of her and the Company gave her a choice: she could either keep her job or exercise her right to pursue her discrimination claims in court. On November 8, 2019,

1113938 v1

Corradino filed this action alleging sexual exploitation, discrimination, and retaliation. The following day, Liquidnet fired her.

2. Corradino brings this action to remedy sexual exploitation and retaliation in violation of the Trafficking Victims Protection Act, 18 U.S.C.A. § 1591; 1595 ("TVPA").

3. In addition, Corradino brings this action to remedy sex discrimination and retaliation in violation of Title VII of the Civil Rights Act as amended, 42 U. S.C. § 2000e et seq. ('Title VII"); the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296; and the New York City Human Rights Law ("NYCHRL"), New York City Administrative Code, § 8–107(1)(a). Pursuant to Section 8-502(c) of the New York City Human Rights Law, Corradino will cause to be served a copy of the Amended Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

## JURISDICTION AND VENUE

4. Jurisdiction of this Court is proper under 28 U.S.C. §1331 and 18 U.S.C.A. §§ 1591 and 1595 as the cause of action arises under federal law.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 2000e–5(f)(3) because Liquidnet's United States headquarters is located in New York, New York, and a substantial part of the events or omissions giving rise to these claims occurred within this District.

6. This Court has supplemental jurisdiction over plaintiff's NYCHRL and NYSHRL claims pursuant to 28 U.S.C. § 1367 because these claims closely relate to her TVPA claims, having arisen out of a common nucleus of operative facts, such that all claims form part of the same case or controversy.

7. On December 23, 2019, Corradino filed a charge against Liquidnet alleging sex discrimination, sexual harassment, and retaliation with the United States Equal Opportunity Employment Commission (the "EEOC"). On August 3, 2020, the EEOC issued plaintiff, on her request, a notice informing her of the right to sue under Title VII.

## PARTIES

8. Corradino is a resident of New York State. She worked at Liquidnet for almost 13 years until the Company fired her on November 9, 2019, the day after she filed this lawsuit.

9. Liquidnet is a holding company specializing in global financial services and technology with over 450 employees. It has locations in several cities throughout the world, with its global headquarters in New York, New York.

10. Merrin is a New York City resident. He is the CEO and majority owner of Liquidnet.

## FACTUAL ALLEGATIONS

### Plaintiff's Background and Employment with Liquidnet

11. Corradino is a renowned HR professional with years of experience in human capital management, talent acquisition, executive coaching, and sales. Since graduating summa cum laude from The College of William and Mary, Corradino has worked for high-profile companies, including as a Division Director for the staffing agency Robert Half International ("RHI"), now a Fortune 500 Company. In that role, Corradino was ranked numerous times as one of RHI's top ten recruiters globally and led RHI's number one placement team in the world.

12. Merrin founded Liquidnet in 2001. Shortly afterwards, Corradino, who

was then working as a recruiter, took on Liquidnet as a client. She worked with Liquidnet in that capacity for approximately four years.

14. In or around December 2006, Liquidnet hired Corradino as a full-time employee with the title of Global Head of Recruiting. In this position, Corradino reported directly to the Global Head of HR and, as second-in-command in HR, Corradino also worked closely with Merrin.

14. Corradino quickly became known as a top performer for Liquidnet. As a result, in 2010, Liquidnet promoted Corradino to assume the responsibilities of the former Head of HR Generalists. She also took on numerous other tasks, including general and international HR functions, as well as compensation and benefits. At the same time, Corradino became responsible for oversight of all HR Generalist and Compensation and Benefits staff.

15. Liquidnet recognized Corradino's potential. For example, Liquidnet held an annual offsite meeting where executives identified employees with strong leadership potential. These high-performing employees were selected by Merrin and Corradino's supervisor, among others. Corradino was included among that list of top performers each year from 2012 to 2018.

Sexual Harassment

16. Unfortunately, to progress within the Company, Corradino had to tolerate a culture of sexual harassment. Corradino herself was subjected to pervasive sexual harassment by a number of senior leaders at Liquidnet and specifically by Merrin, the CEO.

17. Over the course of Corradino's career, Merrin continually pressured Corradino to have sex with him.

18. In or around mid-to-late 2014, during a business meeting in Merrin's

office, Merrin asked Corradino, "What do you do for sex?" Corradino was dumbfounded and wanted to change the subject.

19.     That Merrin wanted to have a sexual relationship with Corradino was obvious to Corradino's colleagues, and particularly humiliating for Corradino. The current Head of Europe, the Middle East, and Africa ("EMEA") and Global Head of Sales at Liquidnet stated that Corradino should date Merrin in order to advance her career. He told Corradino she should "take one for the team." Corradino told him that she was not interested in Merrin and that she does not mix business and personal matters. The Head of EMEA responded by telling Corradino that "not all women are like that" and that "some would not care and just be with him to get ahead because he has a lot of money."

20.     Although Corradino has never reciprocated Merrin's advances, Merrin's conduct toward Corradino continued to escalate.

21.     In or around December 2014, for example, Merrin asked Corradino, in front of the Company's then Chief Technology Officer ("CTO") and his wife, "Are you coming home with me tonight? Are you ever going to come home with me?" Corradino was, once again, humiliated by having Merrin publicly proposition her for sex. Merrin's comments were so inappropriate that the then-CTO confessed to Corradino, "I couldn't believe that, in this day and age. If you ever need me to tell that one, I would." Corradino told him that she had experienced "bad behavior" often from Merrin and some of the other Leadership men in the office but did not know what to do about it.

22.     Merrin also publicly ogled Corradino's body parts. For example, following a charity event attended by Liquidnet employees, an external recruiter who also attended the event reached out to Corradino to express concerns about Merrin's behavior. The

recruiter told Corradino that when Corradino was leaning over a table playing a game at the event, Merrin was "looking at [her] butt so lewdly" and said that Merrin's behavior was "gross."

23. Merrin also frequently made inappropriate comments about other female colleagues. For example, at a Company holiday party, Merrin gave a "toast" to a female employee's husband, thanking the husband for letting Merrin "use his wife" for the past few weeks.

24. In or about May 2018, Merrin gave a quarterly "state of the company" presentation to Liquidnet employees. Towards the end of his presentation, Merrin answered a question about the status of the Company's Initial Public Offering, announcing, "here's the money shot," referring to a vulgar term used in pornography. Several employees (all men) who attended the presentation laughed loudly at this; other people in the room looked around in discomfort.

25. Following the meeting, Corradino spoke with the Company's General Counsel ("GC") to protest Merrin's sexual harassment. Corradino told the GC that, particularly in the wake of the "Me Too" movement, Merrin's statements put the Company at risk. The GC, who also attended the presentation, agreed with Corradino and said she would talk to Merrin about his conduct.

26. This was not Corradino's only complaint. In or around early 2018, Corradino told her supervisor that she personally has had to field inappropriate comments from senior leadership. Corradino said that she was concerned about what was happening to other women at Liquidnet if Corradino was still being subjected to this type of behavior.

27. In or around February 2018, Corradino suggested that the Company act quickly to implement appropriate sexual harassment and discrimination training and proposed

specific training solutions. Remarkably, Corradino's supervisor and others disagreed that the problems needed to be addressed urgently. As a result, the changes Corradino suggested were not implemented until over four months later and were not rolled out to the entire United States division for Liquidnet until September or October 2018.

28. Unfortunately, Corradino continued to be sexually harassed by Merrin. On or about July 16, 2018, for example, Merrin once again hit on Corradino, asking her, "Are you ever coming home with me? How about tonight?"

29. Merrin's inappropriate conduct continued even after the training. In April 2019, Corradino had lunch with Merrin and several other male leaders where Merrin continued to make sexualized comments, including stating that "watching Game of Thrones with [his] daughter was like watching porn with her"; that he was "having dinner with Charlize Theron over the weekend and would like to get with her"; and that a male employee who is openly gay, "didn't know what he was missing" by not having sex with women.

30. During this April 2019 lunch, Merrin also turned his attention to Corradino, repeatedly asking her, "When are you going to get married?" and "When are you going to marry me?" Corradino asked Merrin to stop, telling him that people would start a "vicious rumor" about them. Merrin responded by looking at Corradino with a hurt expression, saying, "really, Mary, a vicious rumor."

31. As Corradino suspected, word spread about Merrin's comments. A week or so after the April 2019 lunch, Liquidnet's Head of Operations told Corradino that he was "sorry to hear what happened." He further stated, "With all the training you all have done around here, I still can't believe Seth [Merrin] doesn't get it. You all neutered me." The Head of Operations told Corradino he would speak to Merrin about the incident.

32. Approximately two weeks after the April 2019 lunch, another colleague who attended the lunch complained to Corradino about Merrin's behavior. This employee, who is gay, told Corradino that he felt Merrin's comments were inappropriate, especially about the gay colleague "[not] know[ing] what he was missing" by not having sex with women.

33. Corradino was far from the only woman sexually harassed by Merrin. For example:

   a. Merrin asked Liquidnet's female GC, "How many drinks would I have to buy you so you would sleep with me?"

   b. Upon information and belief, Merrin required his female assistant to order prostitutes for him;

   c. Merrin incessantly texted a junior female employee who made clear that she was not romantically interested in him; and

   d. Merrin asked another female management-level employee to "go home" with him.

Other Sexual Harassment

34. Merrin was not the only sexual harasser at Liquidnet. In or around winter 2009, the then Chief Operating Officer ("COO") asked Corradino to go out with him for a drink at the bar below Liquidnet's offices. While at the bar, the COO, who was married, asked Corradino, "Have you ever had an affair?" He told Corradino that he had done so "a few times." Corradino, understanding that she was being propositioned for sex, responded by stating that she "did not mix men with work" and does not "mess around with married men." The COO then suggestively asked Corradino, "What do you think, I'd leave my wife for you?"

35. Between 2009 and 2011, Liquidnet's Head of Member Services also asked

Corradino out multiple times, including asking Corradino to join him at his beach house for the weekend. He complimented Corradino's appearance, intelligence and "strength as a woman." He made clear that his interest in Corradino was sexual. For example, he saw Corradino showing another Liquidnet employee a video on YouTube in the Liquidnet offices. Merrin joked that Corradino was "looking at porn," embarrassing Corradino. The Head of Member Services responded, in front of everyone present at the meeting, including Corradino's direct supervisor, that he was "distracted for a second, I mean Mary and porn in the same sentence."

36. The former Head of EMEA repeatedly asked Corradino to go out with him. Corradino did not reciprocate. Nevertheless, after an offsite dinner meeting with members of Liquidnet's senior leadership, he propositioned Corradino for sex, asking her to join him in a hotel room. Corradino said no.

37. In or about July 16, 2018, Liquidnet's then Asia Pacific ("APAC") COO asked Corradino multiple times to "take [him] home tonight." Corradino reported the sexual harassment to Liquidnet's Head of HR for APAC, as well as to Corradino's supervisor.

38. The next night, Corradino attended another group dinner with members of senior leadership. Towards the end of the dinner, some members of the group left to go smoke cigars. As they were leaving, the current Head of EMEA and Global Head of Sales at Liquidnet loudly told Corradino, "You look like you would enjoy a nice big fat Cuban." Corradino, surprised and embarrassed by the obvious sexual implications of his comments, excused herself and left.

39. Corradino also learned that Liquidnet's executives had been making sexual comments about Corradino behind her back. For example, Corradino's colleagues in Liquidnet's London office have repeatedly referred to her as "sexy" and stated that they "love"

her.

40. Moreover, in around 2008 or 2009, Corradino began to suspect that her direct supervisor, the Global Head of HR, had developed a sexual interest in her. During that time, Corradino's supervisor lavished unwanted praise on Corradino's appearance and personality (well beyond what was professionally appropriate), telling Corradino, "You are the whole package, smart, soulful, and beautiful" and "You have an incredible presence."

41. Corradino believed that these flirtatious comments, coming from her boss, not to mention the Head of HR, were inappropriate. Nevertheless, Corradino continued to be polite to her supervisor who effectively controlled Corradino's future at the Company.

42. In or around summer 2009, Corradino's supervisor effectively stopped speaking to Corradino for about a week after learning that Corradino had a boyfriend. Corradino's supervisor subsequently became cool and less friendly towards Corradino.

43. In or around March 2014, Corradino began dating a new man. When her supervisor learned this, the supervisor once again reacted in an upset and accusatory fashion, asking Corradino, "Why didn't you tell me about this?"

Retaliation

44. Over the past year and a half, Merrin and Corradino's supervisor have made clear that they are no longer interested in fostering Corradino's growth at Liquidnet and, to the contrary, that they would block Corradino from future opportunities.

45. For example, Corradino's supervisor refused to have further discussions about Corradino's potential for advancement. Moreover, the supervisor told others that Corradino would not be a "successor" and would be leaving with a "package."

46. On or about August 21, 2019, Corradino's supervisor showed Corradino

restructuring plans, which would effectively strip Corradino of many of her responsibilities, including headcount planning, the employee and peer recognition program, new hire orientation and onboarding, external surveys and the Workplace Experience function and team. According to the supervisor, Merrin "supported" the restructure.

47. The next day, August 22, 2019, Corradino asked her supervisor about what these changes to her responsibilities would mean for her career at the Company. Corradino's supervisor urged Corradino to leave the Company, saying, "You are young. Start new and start over somewhere else. You don't seem happy."

Liquidnet Fires Corradino

48. On September 9, 2019, Corradino complained, through counsel, about Merrin's and Liquidnet's sexual exploitation, discrimination and retaliatory treatment of her. Following Corradino's protected complaint, Liquidnet continued to retaliate against Corradino by, among other actions, threatening her job.

49. On November 6, 2019, Liquidnet announced a mandatory arbitration policy. The policy "require[d]" the Company's employees, including Corradino, "to arbitrate covered claims, instead of litigating them in court," thus "giving up the right to a judge or jury trial."

50. The policy applied to "all claims" raised by Corradino, including her claims of "discrimination, harassment" and "retaliation."

51. The forced arbitration agreement was not limited to claims against the Company. It would also require Corradino to arbitrate her claims against individual "officers," specifically Merrin.

52. Under the rules mandated by Liquidnet, all information about Corradino's

claims, including the arbitration "proceedings," the information (or "discovery") exchanged during the proceedings, and the decisions of the arbitrator (including any findings that Merrin had engaged in sexual exploitation, discrimination and retaliation) would have to remain "confidential."

53. The policy warned that, in certain circumstances, an arbitrator (but not a judge or jury) could impose sanctions against an employee for bringing claims the arbitrator found to be "frivolous" or "solely to harass." The arbitrator, of course, would be paid by Liquidnet.

54. The proposed forced arbitration agreement was signed by Liquidnet's COO. However, unlike most contracts, Corradino would be bound even if she did not sign it. Rather, "[b]y continuing [her] employment with the company for three (3) calendar days after" receiving the agreement, she would be deemed to have "accept[ed]" its terms, including waiving her fundamental rights to go to court to pursue her claims.

55. Corradino wanted to keep her job. She also wanted to preserve her legal rights. On November 7, 2019, Corradino wrote to Liquidnet's GC, stating that she did "not agree" to arbitration. She explained that she wished to "preserve [her] rights to pursue any and all legal claims in court, including those that [she] ha[d] raised already." Corradino made clear that she "intend[ed] to continue working under [her] current arrangements that do not require arbitration."

56. Liquidnet, however, made clear that Corradino could not keep her job and litigate her claims under the arbitration policy, which, for Corradino, would take effect in fewer than two days.

57. In an attempt to keep her job and preserve her legal rights, on November

8, 2019 – before Liquidnet's arbitration policy went into effect – Corradino filed this lawsuit, exercising her rights under the law to have her sexual exploitation, discrimination and retaliation claims heard in a court of law before a jury. She immediately notified Liquidnet that she had filed her suit thereby "exercis[ing] her right to pursue her [her] legal claims in court" as she was not yet "bound by any arbitration agreement."

58. Liquidnet, however, made clear that Corradino would have to "dismiss [her] lawsuit" in order to keep her job, effectively firing Corradino.

59. Corradino wrote back to Liquidnet's GC that, in that case, "Liquidnet [had] terminated [her] employment." She again stated that she did "not consent to pursuing [her] claims in secret arbitration" and further emphasized her belief that "the Company's actions, including the termination of [her] employment, were taken in retaliation for complaining about discrimination and for filing a lawsuit."

<u>FIRST CAUSE OF ACTION</u>
TVPA: Sexual Exploitation (Against Defendants)

60. Plaintiff repeats and realleges paragraphs 1 through 59 above.

61. By the acts and practices described above, defendants have subjected plaintiff to sexual exploitation by offering something of value—job advancement opportunities—in exchange for sex.

62. Liquidnet is a multi-national company that engages in interstate commerce. Merrin is Liquidnet's CEO.

63. Plaintiff suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendants' practices.

## SECOND CAUSE OF ACTION
TVPA: Retaliation (Against Defendants)

64. Plaintiff repeats and realleges paragraphs 1 through 63 above.

65. By the acts and practices described above, defendants have retaliated against plaintiff for her opposition to defendants' unlawful conduct.

66. Liquidnet is a multi-national company that engages in interstate commerce. Merrin is Liquidnet's CEO.

67. Plaintiff suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendants' practices.

## THIRD CAUSE OF ACTION
Title VII: Discrimination
(Against Liquidnet)

68. Plaintiff repeats and realleges paragraphs 1 through 67 as if fully set forth herein.

69. By the acts and practices described above, Liquidnet discriminated against plaintiff in the terms and conditions of her employment on the basis of her sex in violation of Title VII.

70. Liquidnet engaged in these discriminatory practices with malice and with reckless indifference to plaintiff's rights protected under federal law.

71. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, and mental anguish, humiliation and damage to reputation, as a result of Liquidnet's discriminatory practices unless and until this Court grants relief.

## FOURTH CAUSE OF ACTION
### Title VII: Retaliation
### (Against Liquidnet)

72. Plaintiff repeats and realleges paragraphs 1 through 71 as if fully set forth herein.

73. By the acts and practices described above, Liquidnet retaliated against plaintiff for her opposition to unlawful discrimination, in violation of Title VII.

74. Liquidnet acted with malice and/or reckless indifference to plaintiff's rights protected under federal law.

75. As a result of Liquidnet's retaliatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

## FIFTH CAUSE OF ACTION
### NYSHRL: Discrimination
### (Against Defendants)

76. Plaintiff repeats and realleges paragraphs 1 through 75 as if fully set forth herein.

77. By the acts and practices described above, defendants, in violation of the NYSHRL, discriminated against plaintiff on the basis of her sex.

78. Defendants acted intentionally and with malice and/or reckless indifference to plaintiff's statutorily protected rights.

79. Merrin is liable as an aider and abettor, including for aiding and abetting Liquidnet's unlawful acts.

80. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendants' discriminatory practices.

SIXTH CAUSE OF ACTION
NYSHRL: Retaliation
(Against Defendants)

81. Plaintiff repeats and realleges paragraphs 1 through 80 as if fully set forth herein.

82. By the acts and practices described above, defendants, in violation of the NYSHRL, retaliated against plaintiff because of her opposition to defendants' unlawful conduct.

83. Defendants acted intentionally and with malice and/or reckless indifference to plaintiff's statutorily protected rights.

84. Merrin is liable as an aider and abettor, including for aiding and abetting Liquidnet's unlawful acts.

85. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendants' discriminatory practices.

SEVENTH CAUSE OF ACTION
NYCHRL: Discrimination (Against Defendants)

86. Plaintiff repeats and realleges paragraphs 1 through 85 as if fully set forth herein.

87. By the acts and practices described above, defendants, in violation of the NYCHRL, discriminated against plaintiff on the basis of her sex.

88. Merrin is liable as an aider and abettor, including for aiding and abetting Liquidnet's unlawful acts.

89. Defendants acted intentionally and with malice and/or reckless indifference to plaintiff's statutorily protected rights.

90. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendants' discriminatory practices.

### EIGHTH CAUSE OF ACTION
### NYCHRL: Retaliation (Against Defendants)

91. Plaintiff repeats and realleges paragraphs 1 through 89 as if fully set forth herein.

92. By the acts and practices described above, defendants, in violation of the NYSHRL, retaliated against plaintiff because of her opposition to defendants' unlawful conduct.

93. Defendants acted intentionally and with malice and/or reckless indifference to plaintiff's statutorily protected rights.

94. Merrin is liable as an aider and abettor, including for aiding and abetting Liquidnet's unlawful acts.

95. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendants' discriminatory practices.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a Judgment:

(a) declaring the acts and practices complained of herein to be violations of the TVPA, Title VII, the NYSHRL, and the NYCHRL.

(b) enjoining and permanently restraining these violations of the TVPA, Title VII, the NYSHRL, and the NYCHRL.

(c) directing defendants to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d) directing defendants to place plaintiff in the position she would have occupied but for defendants' discriminatory and retaliatory treatment of her, and making her whole for all earnings and other benefits she would have received but for defendants' discriminatory treatment, including but not limited to wages, including back pay and front pay, bonuses, and other lost benefits;

(f) directing defendants to pay plaintiff punitive damages under the TVPA;

(g) directing defendants to pay plaintiff compensatory damages, including damages for emotional distress, humiliation, pain and suffering, and injury to professional standing and reputation;

(h) directing defendants to pay plaintiff additional amounts as punitive damages;

(i) awarding plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award;

(j) awarding plaintiff the costs of this action, together with reasonable attorneys' fees; and

(k) awarding such other and further relief as this Court deems necessary and proper

## DEMAND FOR A TRIAL BY JURY

      Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
        August 4, 2020

                            VLADECK, RASKIN & CLARK, P.C.

      By:      /s/
                Anne L. Clark
                Emily Miller
                Attorneys for Plaintiff
                565 Fifth Avenue, 9th Floor
                New York, New York 10017
                (212) 403-7300